Brian J. Miller
MORRISON SHERWOOD WILSON & DEOLA, PLLP
401 North Last Chance Gulch
P.O. Box 557
Helena, MT 59624-0557
406-442-3261 Phone
406-443-7294 Fax
bmiller@mswdlaw.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA, BILLINGS DIVISION

| | |
|---|---|
| STEPHANIE MORUP,<br><br>                    Plaintiff,<br><br>    v.<br><br>DENIS McDONOUGH, Secretary of<br>Veterans Affairs<br><br>                    Defendant. | Case No. <u>CV-24-04-BLG-SPW-TJC</u><br><br>**COMPLAINT AND JURY<br>DEMAND** |

### 1. Allegations Pertaining to Jurisdiction

1. Plaintiff Stephanie Morup is a resident of Billings, Montana.  She is a licensed Orthopedic Physician Assistant.

2. Denis McDonough is the Secretary of the Department of Veterans Affairs.

3. Stephanie was formerly employed at the Benjamin Steele VA Clinic, 1776 Majestic Lane, Billings, Montana. ("Billings VA").

4. On February 14, 2022, Stephanie initiated a complaint against the Billings VA pursuant to 42 U.S.C. 2000e ("Title VII") of the Civil Rights Act of 1964.

5. The matter was formally investigated and given an EEOC Case No. 550-2023-00079X.

6. On October 12, 2023, the EEOC issued a "Final Agency Decision" denying the complaint and informing Stephanie that she had 90 days to file an action in Federal District Court if she chose to do so.

7. Jurisdiction in this Court is proper pursuant 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

8. Venue is proper in the Billings division pursuant to L.R. 3.2(b)(1)(A) because the tortious conduct occurred, in part in Yellowstone County where the Veterans Administration is located.

## II. General Allegations

9. Stephanie had been working as an Orthopedic P.A. at the Billings Clinic since January 18, 2018.

10. Stephanie was a good employee at the Billings VA. Stephanie had never had any problems or issues with her work. She received solid performance reviews from her supervisors. (EEOC Investigative Record Doc. 408-09). **Excerpts attached as Exhibit A.**

Plaintiff's Complaint and Demand for Jury Trial                    2

11. In September of 2021, Stephanie had to go through the re-credentialling process with the Billings VA in order to maintain her privileges there. On September 27, 2021, she was asked by Dana Hannen, a VA employee involved in credentialling department, to begin submitting documents related to the recredentialling process.

12. At the time, Stephanie thought she had until January 6, 2022, to submit her credentials.

13. Stephanie was extremely busy at the Billings VA serving veterans and did not initially complete the re-credentialling process.

14. In November of 2021, Ms. Hannen reached out to Stephanie again about the recredentialling process. At that time, Stephanie completed a written portion of the credentialling process, but did not complete the entire process because she was having difficulties logging into her "vet pro" account which was another requirement for credentialling.

15. In January of 2021, Stephanie worked diligently to complete the credentialling process. As of January 6, 2021, she reasonably believed that she had submitted all of materials required to be recredentialled. (Doc. 807-809).

16. On January 6, 2022, Stephanie's clinical privileges were suspended due to the fact that her credentials were expired and her "vet pro" appointment was

not completed.  The notice of suspension informed Stephanie that as soon as the appropriate corrective action was taken her credentialing information would be reviewed for her reinstatement.  (Doc. 128).

17. Stephanie was on medical leave from January 11-20, 2022. (Doc. 814). During this time, her credentialling process was not moving forward.

18. On January 19, 2022, Kevin Mitchell, the President for the local union, emailed Janine Lester at Stephanie's request to inquire as to why she had not been recredentialed.  In the email, Mr. Mitchell summarized the timeline of events and noted that she had complied with all of the necessary requirements and that patient care was suffering due to the fact that she was not recredentialled. (Doc. 796).

19. Janine Lester was a Credentialing and Privileging Manager at the VA, and was one of Maganito's trusted lieutenants.   Ms. Lester responded on January 19, 2022, at 8:28 PM.  In the email, Lester claimed Stephanie was not being recredentialled for the following reasons:

   a. The State of Montana regulations required Stephanie to have an appropriate supervising physician listed on her current license; and

   b. Stephanie's peer references had not been provided.

(Doc. 786).

20. As to both items, Stephanie was unaware that there were any issues with either of them.  Stephanie had never had to handle the specific issue of the supervising physician in any of the 5 previous facilities she had worked at, as that was handled by the facility itself. This included the VA when she was first hired. This new requirement was perplexing to Stephanie.

21. As to the second item, she had provided the appropriate peer references prior to January 5, 2022, and was not aware that they had not been contacted.

22. On January 7, 2022, Dana Hannen, claimed she attempted to contact Stephanie's peer references and was unable to contact them.  She sent Stephanie an email on January 7, 2022, claiming that she had been unable to contact the references by email and had left them phone messages. (Doc. 791).

23. Stephanie subsequently contacted the physicians, all of whom denied ever receiving any messages from the VA. (Doc. 791).

24. In the January 19, 2022, email, Lester stated that Stephanie could return to work the next day, and that she would still be on an administrative suspension, pending the receipt of these items.  Lester stated that the issues of the supervising physician would be remedied by the submission of additional paperwork, and that her peer references would be verified. (Doc. 792).

25. However, on January 20, 2022, Lester was also emailing Eric Mastas, the VISN19 Credentialling Officer for the VA Rocky Mountain Network, inquiring if Stephanie could be terminated for failing to submit her credentialling packet and vet pro before the deadline to do so. (Doc. 820).

26. That same day, Maganito personally wrote to Mastas asking to help him in "taking action on" Stephanie. (Doc. 818).

27. There was no rational reason for Lester and Maganito to take such a hostile attitude towards Stephanie at this time. She was a good employee. While she admitted that she had failed to get her paperwork on time initially, she was cooperative and responsive in getting the matter resolved. The credentialling process, while important, was merely ministerial as there was absolutely no doubt that she was highly qualified and providing critical care to veterans.

28. Prior to this time, Maganito had developed a gender-based animus against Stephanie based on previous interactions between them. This animus towards Stephanie appeared to arise from a prior situation when Maganito wanted to allow the VA clinic to see patients for orthopedic care without a referral. Stephanie had researched the matter and learned that this was not permitted. Nevertheless, Maganito wanted her to do it. When she refused, he became hostile and demeaning to her, displaying a gender-based animus

against her because he perceived that his authority had been challenged by a woman. (Doc. 72).

29. Upon information and belief, Maganito has displayed this same gender-based animus towards women on other occasions when he has perceived them questioning his decision-making process in any way, even if his decision-making process or judgment was in error and should reasonably be questioned.  For reasons that are not entirely clear, it appears that this is an aspect of Maganito's internal thought process, and that he has engaged in this same thought process with respect to other women in this manner as a pattern and practice against women, and that he is prone to use employment retaliation tactics against others as a way to satisfy his need to assert control or dominance over others.  Upon information and belief, the manner in which Maganito treated Stephanie as a woman was not just limited to her alone.

30. When she returned from medical leave, Stephanie made sure that all of the necessary paperwork was promptly completed so that she could be recredentialled and get back to work.   (Doc. 147-50).

31. If Maganito and Lester had been behaving rationally and had not been motivated by animus, they would have been actively assisting Stephanie to make sure this got done as soon as possible so that she could resume care for

veterans, which was the primary purpose of the VA. There would be absolutely no reason for there to be any animosity or adversity towards Stephanie for this hiccup in her paperwork. Stephanie was professional about the matter the entire time and took responsibility for failing to take care of this matter sooner.

32. However, on January 20, 2022, Maganito invented a new requirement for Stephanie's recredentialling, claiming that that in order for Stephanie to be credentialled at the VA she had to have on-site physician requirement. There was absolutely no basis for this condition. The purpose of this fictious requirement was to prevent Stephanie from being credentialled as an act of discrimination and retaliation, as it was not motivated by any rational basis, and had the effect of depriving veterans of much-needed care for no reason at all. (Doc. 351).

33. Stephanie was then threatened with termination if she did not obtain an on-site physician to supervise her. (Doc. 125).

34. Stephanie enlisted the help of her union representative, Kevin Mitchell to assist her in resolving this matter. On January 21, 2022, Mitchell emailed Edna Clausen, another member of the VA credentialling staff, questioning the requirement for an on-site physician. Mitchell provided Clausen an email from Scot Burroughs, the Executive Direction for Physician Services

for the VA in Washington, D.C., stating that the imposition of a requirement for an on-site physician was an "overreach". (Doc. 797).

35. In another email on January 21, 2022, Mitchell also noted that the VA's actions towards Stephanie appeared "vicious and cruel". (Doc. 796).

36. On January 27, 2022, Lester stated that Stephanie's "state license has been updated, with an active Montana VA provider.  Credentialing will move forward with completely the package. Our next meeting is on Tuesday at 2:30 p.m., and we will present Morup for renewal." (Doc. 823).

37. Lester also stated that she saw "no obstruction" on completing the process. (Doc. 123).  This should have been the end of the story and Stephanie should have been recredentialled and back to work serving veterans.  But Maganito had other plans.

38. On February 1, 2022, Lester sent an email regarding the outcome of the credentialling review. In the email, it states that Dr. Alford, another doctor at the VA who was involved in Stephanie's case, had reviewed Stephanie's file, "with no red flags revealed. Peer references, work history and education show, she is competent to provide the clinical privileges she is requesting.  I recommend privileges and appointment with a 90 day FPPE." (Doc. 810).

39. However, the credentialling committee, over which Maganito exerted his control, refused to recredential Stephanie based on "Concerns for not

following the bylaws and Montana State License board process presented. Committee voted to hold expectations of bylaws and rules and regulations of the State of Montana." (Doc. 810).

40. However, Stephanie was in full and complete compliance with the bylaws and rules and regulations of the State of Montana.

41. Apparently, what the Committee was referring to was a situation where Stephanie's previous supervising physician had left the VA, technically leaving her without a supervising physician from that time forward. However, this omission had never been brought to Stephanie's attention, had never been raised as an area of concern, and had zero impact on her job performance. Stephanie was completely unaware that she may have been technically required to obtain a new supervising physician when the previous one retired.

42. In any event, regardless of any prior period where Stephanie may not have technically had a supervising physician appointed, she had resolved that matter in the recredentialling process.

43. On February 2, 2022, Stephanie emailed Ralph Gigliotti , the Chief of Staff for the region in which the Billings VA was located.  In the email, Stephanie relayed the chain of events that had occurred, and explained to Mr. Gigliotti

that the delay in her recredentialling was compromising care at the VA. (Doc. 780).

44. Stephanie noted to Mr. Gigliotti that there were several avenues available to the VA to quickly credential her and get her back to serving VA patients. (Doc. 781-83).

45. Stephanie noted in the email to Gigliotti that when she asked Lester what the hold-up was in getting her recredentialled, she was told that "the powers that be need more time". (Doc. 784).

46. Upon information and belief, Maganito received a copy of this email, and was further enraged and embarrassed by it, as he perceived it as another example of Stephanie, a woman, challenging his decision-making and judgement.  (Doc. 76-77).  Stephanie's action, which was protected, increased Maganito's desire to assert dominance over Stephanie and led to further retaliation against her by Maganito.

47. Maganito had a prior history of sexist animosity against Stephanie because he perceived that Stephanie had challenging his decision-making process and questioned his judgment on prior occasions, which Maganito believed was wrong for a woman to do.  As Stephanie described it to the EEOC investigator, her interactions with Maganito were not very positive and he made sure she knew he was "boss". (Doc. 39).

48. Upon information and belief, Maganito had acted towards other women, in similar ways, as well. That is to say, if Maganito perceived that a woman was questioning his decision-making in any way, he would retaliate against them in a similar manner because of his discriminatory belief system against women.

49. On February 7, 2022, Lester informed Stephanie that she was declined for recredentialling and that she would have to work through HR for any further concerns. (Doc. 143).

50. On February 8, 2022, Stephanie was reassigned by James Maganito from her position as an orthopedic P.A. to the COVID-19 screening hut. (Doc. 802). The decision to assign Stephanie to the screening hut was entirely made by Maganito with a sexually-based discriminatory animus to punish her and to retaliate against her for engaging in protected activity.

51. Maganito attempted to conceal his involvement in the decision to place Stephanie in the COVID hut by having Dr. Alford sign the document announcing her administrative suspension. Dr. Alford was another physician at the VA who was involved in Stephanie's case and was aware of the entire situation. Dr. Alford claimed that Maganito was the decision-maker and he, Dr. Alford, believed the assignment was harmful. (Doc. 195; 214).

Plaintiff's Complaint and Demand for Jury Trial                                      12

52. Furthermore, during this time Alford was himself subject to a hostile work environment by Maganito, which led to him being fired on June 30, 2022, and subsequently being reinstated. (Doc. 209; 217).

53. The circumstances demonstrate that Maganito was the sole decision-maker responsible for placing Stephanie in the COVID hut and denying her the ability to get recredentialled.

54. Stephanie, along with other women, were placed in the COVID screening hut during administrative suspensions during Maganito's reign.  However, Stephanie is aware of at least two other male doctors who were also placed on administrative suspension during this time and were not required to work in the COVID screening hut, but instead allowed to remain in their offices. (Doc. 31; 74).

55. In communications on February 8, 2022, between Maganito and Stephanie, Maganito acted as if he did not have any knowledge regarding Stephanie's situation.  Maganito claimed that Dr. Alford was knowledgeable about her situation and that he would have to look into his emails to determine what was going on. Maganito encouraged Stephanie to contact human resources regarding her situation. (Doc. 140-142).

56. However, as noted above, Maganito was the driving force behind the decision to reassign Stephanie to the COVID hut and was fully aware that he

was the sole cause of the conduct directed at Stephanie.  In written statements subsequently provided to the EEOC investigator, Dr. Alford stated that Maganito took it upon himself to reassign Stephanie to the COVID screening hut.  Dr. Alford also stated that once Maganito reassigned Stephanie, he removed Dr. Alford from having any further involvement in Stephanie's situation. (Doc. 203).

57. The facts and circumstances show that Maganito was actively attempting to conceal his involvement in the decision to discriminate and retaliate against Stephanie.

58. Dr. Alford stated he was "under considerable duress" at the time. (Doc. 206).  Dr. Alford also said that it did not appear to him that Lester and Maganito were willing to work with Stephanie on her re-credentialing. (Doc. 217). Dr. Alford also stated that he was being subject to a "tremendous amount of hostile work environment myself." (Doc. 218).

59. The decision to assign Stephanie to the COVID hut, and the invention of a fictious credentialling requirement to have an onsite supervising physician for Stephanie, were the result of Maganito's actions alone.  They are both acts of gender discrimination, as well as acts intended to retaliate against Stephanie for challenging the discriminatory behavior against her.

60. There was no rational basis for these actions, and they were strictly punitive and humiliating, and designed to harm Stephanie. They also had a negative and adverse effect on patient care by depriving veterans of the ability to access Stephanie's services for no reason at all. Yet, Maganito's animus towards Stephanie was so overpowering that he was willing to deprive veterans of much-needed care in order to satisfy his desire to assert dominance over Stephanie and punish her because she was a woman who he perceived had questioned his judgment.

61. Although Maganito dissembled and acted as if he had no knowledge of these matters, Lester admitted in her sworn statement that she was aware of the complaint that Stephanie had submitted to Mr. Gigliotti. (Doc. 260).

62. Given Lester's close relationship with Maganito, and her direct involvement in creating a hostile environment against Stephanie and Dr. Alford, as well as considering the other circumstantial evidence, it can be reasonably inferred that Maganito was aware of the email to Gigliotti.

63. Dr. Alford stated that although there was no basis in fact for the requirement that Stephanie have an on-site supervising physician, Lester stated "very publicly" that there was. (Doc. 217).

64. Dr. Alford also stated that Lester actively prevented him from being assigned as a collaborating physician for Stephanie. (Doc. 214).

65. Numerous other witnesses also stated that there was no basis for the on-site physician rule, or that they did not know where the requirement came from. (Doc. 361, 363-64, 368; 799).

66. The placement of Stephanie in the COVID hut was a cause of extreme distress for Stephanie because it required her to interact with patients, but she was told she could not communicate with them, explain why she could not treat them, or that she would be disciplined. (Doc.74; 835).

67. Alongside her placement in the COVID hut, rumors were circulated that Stephanie was being investigative for unspecified wrongful conduct. Among other things, Stephanie was being falsely accused of missing appointments by Lester (Doc. 350) and misreporting her time. (Doc. 814).

68. Maganito was the likely sources of these rumors.  Although he denied any knowledge of Stephanie's situation, Lester reported that a "list of concerns" about Stephanie was brought to her by Maganito. (Doc. 62).

69. Lester, Maganito's lieutenant, denied knowing that Maganito was responsible for assigning Stephanie to the COVID hut, in an effort to cover for him. (Doc. 272).  Lester also denied that Stephanie was under investigation. (Doc. 274).   These denials are not plausible.

70. Moreover, documents produced in the EEOC investigation reference an unspecified investigation and other witnesses expressed an awareness of an investigation against Stephanie.  (Doc. 354, 814).

71. No staff could explain, however, what Stephanie was actually being investigated for (Doc. 354), and there was no basis for any investigation.

72. When Stephanie asked why she was being investigated, and what she was being investigated for, she received no response. (Doc. 9).

73. Stephanie contacted the EEOC on 2/14/22. Maganito was the Responding Management Official (RMO).  Maganito was not responsive to attempts to communicate with him. (Doc. 40; 179-80).

74. Similarly, in another case when Maganito was being investigated for "alleged abuse, waste, and mismanagement leading to two allegations of failure of care at the VA medical center," he refused to respond to valid subpoenas requiring their enforcement by Court order. *U.S. v. Maganito*, 2023 U.S. Dist. LEXIS 73000, at * 8-9 (D. Mont. April 26, 2023).

75. From this point forward, Maganito continued to impose the requirement on Stephanie that she have an on-site supervising physician for her licensure, and that she remain on administrative suspension in the COVID hut, even though there was no such requirement anywhere in the law or regulations, and he had been informed as such. Indeed, there were two other PAs at the

VA facility upon whom this requirement was not imposed. (Doc. 73).  Yet,
Maganito believed that he could do what he wanted to, regardless of the
consequences to veterans' medical needs, if it served his interest of
retaliating against Stephanie, asserting his dominance over her, and driving
her from her position.

76. Stephanie agreed to participate in a mediated process to resolve this dispute.
Maganito continued to push this baseless position in the mediation context
as well. (Doc. 31).

77. From this time forward, nothing was done to credential Stephanie.  She had
provided all of the information required, and there was no rational basis or
reason to deny her credentialling and leave her in the COVID hut, other than
a discriminatory and retaliatory animus.  And not only did Maganito harm
Stephanie, but he harmed veterans as well.

78. On April 26, 2022, Stephanie emailed human resources as directed by
Maganito to find out what she needed to do to be removed from
administrative suspension and get back to work treating patients since
nothing was changing with her situation.  Neither human resources, nor Dr.
Alford, had any information for her about her situation, even though
Maganito had expressly told her to work with HR and Dr. Alford going
forward.  (Doc. 249-50; 795). This is further evidence of Maganito's

dissembling in an attempt to conceal his direct involvement in the discriminatory and retaliatory actions against Stephanie and speaks to a consciousness of guilt.

79. On April 28, 2022, Stephanie resigned from the Billings VA because she had no options.  Maganito would not allow her to be credentialled by imposing fictious and malicious requirements on her, in an effort to punish her and drive her from the VA.  (Doc. 151).

80. The facts and circumstances described herein give rise to a reasonable inference that the refusal to recredential Stephanie, and her placement in the COVID hut, were acts of intentional gender discrimination and retaliation for Stephanie's efforts to oppose such discrimination.   The circumstances show that Maganito was motivated by an irrational, gender-based animus in these actions against Stephanie, based on his perception that she was a woman questioning his decision-making and judgment.  There can be no other rational basis explaining Maganito's conduct, other than an irrational desire to assert dominance over Stephanie.

81. Stephanie was a strong employee.  By not credentialling her, Maganito was depriving veterans of much-needed care and actively damaging the VA's operations.  Even when Stephanie had undoubtedly supplied all of the necessary information, Maganito still refused to credential her, and forced

her to stay in the COVID hut which he knew was humiliating. No rational person in Maganito's position would have taken this action, and it can only be explained by a discriminatory and retaliatory animus.

82. Maganito dissembled when he acted as though he was unaware of Stephanie's situation, in an effort to cover his tracks. The record shows that from the very beginning of this matter, Maganito sought to use Stephanie's initial failure to timely submit the paperwork as a pretext to terminate her, which was motivated by his prior interactions with her when he perceived that she questioned his decision-making process.

83. Maganito told Stephanie to work through HR and Dr. Alford regarding her situation. Yet, neither HR nor Dr. Alford had any information about her situation or understood why she was not being recredentialled; indeed, Dr. Alford actively recommended that she be recredentialled.

84. Stephanie suffered emotional distress and humiliation as a result of this wrongful conduct.

85. Stephanie suffered other economic losses as a result of the loss of pay and benefits at the VA from being forced to quit her job.

## III. Count I- violation of 42 USC § 2000e

86. The foregoing paragraphs are re-alleged as though set forth in full herein.

87. Prior to the actions taken against Stephanie with respect to her credentialling process, Maganito harbored a gender-based discriminatory animus against her, because he perceived that she had questioned his decision-making process with respect to the matters described above in paragraph ¶ 28.

88. Maganito acted on this discriminatory animus when Stephanie had issues with her credentialling by exploring ways he could use the incident as a pretext to terminate and discriminate against her, and assert his dominance over her.

89. When Stephanie reported the problems she was having with her recredentialing process at the VA to Mr. Gigliotti, she was opposing the discriminatory practices that Maganito had initiated against her, based on the circumstances of the context of her relationship with Maganito as well as Maganito's conduct.

90. When Maganito assigned Stephanie to the COVID hut, and created false reasons for obstructing her recredentialling, he was doing so as both a method of retaliation, and as an act of intentional gender discrimination.

91. Maganito's actions resulted in a constructive discharge, by placing Stephanie in a position where she could not get recredentialled and was forced to work in the COVID hut with no end in sight to her administrative suspension.

92. Defendant is in violation of 42 USC § 2000e-2(a)(1) based on the conduct described herein, by engaging in conduct which discriminated against Stephanie with respect to the terms, conditions, and privileges of her employment on the basis of her sex.

93. Defendant is in violation of 42 USC § 2000e-2(a)(2) based on the conduct described herein, by engaging in practices which limited and segregated Stephanie in a manner which deprived her of employment opportunities and adversely affected her status on the basis of her sex.

94. Defendant is in violation of 42 USC § 2000e-3(a) based on the conduct described herein, by engaging in the practices which sought to retaliate against Stephanie based on her opposition to Defendant's discriminatory practices, which constituted a protected activity.

95. As a result of these violations of Title VII, Stephanie has endured emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, for which she is entitled just compensation.

96. Stephanie also suffered economic losses as a result of Defendant's violation of Title VII, including wage and benefit loss.

WHEREFORE, Plaintiff prays for the following relief

1. A jury trial on this cause of action;

2. That Defendant should be subject to the relief in 42 USC § 2000e-5(g), including affirmative action necessary to remedy the practices and back pay, and any other equitable relief that is appropriate.

3. That Plaintiff should receive compensatory damages as set forth above;

4. That Plaintiff be awarded attorney fees as allowed pursuant to 42 U.S.C. § 2000e-5(k); and

5. Any other relief which the Court deems reasonable and just.

Dated this 9th day of January, 2024

*/s/ Brian J. Miller*
Brian J. Miller
Attorney for Plaintiff